IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| EDWARD ODJAGHIAN | * | |
| 12376 Fernando Dr. | * | |
| San Diego, CA 92198 | * | |
| | * | |
| And | * | |
| | * | |
| GORDON NASTA | * | |
| 7513 West Hillside Road | * | |
| Crystal Lake, IL 60012 | * | |
| | * | |
| PLAINTIFFS, | * | |
| | * | |
| v. | * | Civil Action No.: 1:18-cv-151 |
| | * | |
| ENGAGEPOINT, INC. | * | |
| Serve: The Corporation Trust, Incorporated | * | JURY TRIAL DEMANDED |
| 2405 York Road, Ste. 201 | * | |
| Lutherville-Timonium, MD 20193 | * | |
| | * | |
| And | * | |
| | * | |
| HHS TECHNOLOGY GROUP, LLC | * | |
| Serve: Corporation Service Company | * | |
| 1201 Hays Street | * | |
| Tallahassee, FL 32301 | * | |
| | * | |
| And | * | |
| | * | |
| BREVET CAPITAL MANAGEMENT, LLC | * | |
| 230 Park Avenue, Ste. 1525 | * | |
| New York, NY 10169 | * | |
| | * | |
| And | * | |
| | * | |
| BRADLEY WHITE | * | |
| 6600 N. Andrews Avenue, Ste. 570 | * | |
| Fort Lauderdale, FL 33309 | * | |
| | * | |
| DEFENDANTS. | * | |

**************************************************************************

**COMPLAINT**

Plaintiffs Edward Odjaghian and Gordon Nasta, by undersigned counsel, hereby submit their Complaint against Defendants EngagePoint, Inc. ("EngagePoint"), HHS Technology Group, LLC ("HHS"), Brevet Capital Management, LLC ("Brevet"), and Bradley White.

**STATEMENT OF THE CASE**

1. EngagePoint, Brevet, and White sold EngagePoint's assets to HHS in a sham auction and claimed EngagePoint was insolvent in an attempt to avoid paying Plaintiffs—their former employees—salary and severance. This lawsuit is to recover these unpaid wages as well as additional compensation owed to Plaintiffs pursuant to their severance agreements.

2. Plaintiffs were employees of EngagePoint, a healthcare technology company. Facing financial difficulty, EngagePoint borrowed money from venture capital firm Brevet in 2014 and provided Brevet a security interest in EngagePoint's assets. Despite the loan, EngagePoint continued to face cash flow issues and almost immediately fell behind on its payments to Brevet. Brevet began to exercise control over EngagePoint's business through its grant or denial of loans that kept EngagePoint operating.

3. By 2017, EngagePoint had several valuable assets including its software programs and contracts with a number of state governments to provide software and related services. EngagePoint also had several liabilities, including agreements to repay executives like Plaintiffs deferred salary and severance.

4. In March 2017, EngagePoint fired Plaintiffs without cause as a cost-saving measure. EngagePoint entered severance agreements with Plaintiffs that included compensation for their deferred wages and severance.

5.  After a single payment to Plaintiffs in May 2017, on June 6, 2017, EngagePoint CEO Bradley White informed Plaintiffs that Brevet had foreclosed on the loan and sold EngagePoint's assets at an auction that was held on June 5, just one week after the sale had supposedly been advertised.  HHS, a company that shares an address with Brevet and was not formed until a day after the sale, purportedly purchased the company at auction on June 5.  White told Plaintiffs that the sale did not generate enough money to pay Plaintiffs and that EngagePoint was insolvent.  HHS, meanwhile, hired EngagePoint's remaining leadership team and employees and began conducting EngagePoint's business without paying EngagePoint's liabilities to Plaintiffs.

6.  EngagePoint, Brevet, and White are each liable for Plaintiffs' unpaid wages as Plaintiffs' employers while HHS is liable for the unpaid wages and for breach of contract as EngagePoint's successor. Brevet is also separately liable for both the wages and severance because it violated Maryland's secured transactions law.

## PARTIES

7.  Plaintiff Edward Odjaghian is an adult resident of California and former employee of EngagePoint, Brevet, and White.

8.  Plaintiff Gordon Nasta is an adult resident of Illinois and former employee of EngagePoint, Brevet, and White.

9.  EngagePoint is a Florida corporation with its principal place of business in Calverton, Maryland.

10. HHS is a Delaware limited liability company with its principal place of business at 230 Park Avenue, Suite 1525, New York, New York 10169.

11.     Brevet is a Delaware limited liability company with its principal place of business at 230 Park Avenue, Suite 1525, New York, New York 10169.

12.     Bradley White, upon information and belief, is an adult resident of New Jersey. White was the former CEO of EngagePoint and is the current CEO of HHS.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and upon information and belief, the parties are citizens of different states.[1]

14.     This Court has personal jurisdiction over Defendant EngagePoint pursuant to Md. Code, Cts. and Proc., § 6-102 as EngagePoint maintains a principle place of business in Maryland.

15.     This Court has personal jurisdiction over Defendant Brevet pursuant to Md. Code, Cts. and Proc., § 6-103 as Brevet transacted business in Maryland, first acting as a joint employer with and entering loan agreements with EngagePoint, and then foreclosing those loans and purchasing EngagePoint's assets through HHS.

16.     This Court has personal jurisdiction over Defendant HHS pursuant to Md. Code, Cts. and Proc., § 6-103, as HHS transacted business in Maryland by purchasing EngagePoint.

17.     This Court has personal jurisdiction over Defendant White pursuant to Md. Code, Cts. and Proc., § 6-103, as White transacted business in Maryland by acting as the CEO of EngagePoint and its successor HHS.

18.     Venue is proper in this district because a substantial part of the events or omissions related to Plaintiffs' work for EngagePoint and Brevet, the sale of EngagePoint, and

---

[1] Plaintiff has not identified all members of HHS and Brevet. The information available to Plaintiffs indicates that complete diversity exists.

4

EngagePoint's, Brevet's, HHS's and White's failure to pay Plaintiffs occurred in this district through EngagePoint's corporate headquarters.

## FACTS

19. EngagePoint is a software company that sold proprietary software to government entities and private companies.

20. Odjaghian was an employee of EngagePoint from March 1, 2007 until March 15, 2017.

21. Nasta was an employee of EngagePoint from November 2, 2015 until March 15, 2017.

22. Odjaghian and Nasta each had written employment contracts with EngagePoint that provided that they were entitled to severance if EngagePoint terminated them without cause. (Odjaghian's contract is attached as Exhibit 1 and Nasta's contract is attached as Exhibit 2).

*EngagePoint Faced Financial Difficulties and Borrowed Money from Brevet*

23. In 2013, EngagePoint began to experience financial difficulties because of issues with a contract EngagePoint had with the state of Missouri.

24. In December 2014, EngagePoint accepted a $20 million loan from Brevet, a venture capital firm from New York, to fund its operation.

25. In April 2016, EngagePoint asked several of its executives to defer their salaries because of cash flow problems.

26. Nasta went without salary from April 1, 2016 until July 15, 2016, deferring $71,903.79 in salary.

27. In exchange for agreeing to defer this salary, EngagePoint agreed to provide Nasta C-1 shares in an amount equal to the salary he deferred.

28. Odjaghian accepted reduced salary from April 1, 2016 until July 15, 2016, deferring $16,953.02 in salary.

29. Odjaghian also deferred his 2013 executive bonus of $217,568 at EngagePoint's request.

30. From December 2014 to March 2017, EngagePoint periodically accepted additional loans from Brevet such that, combined with the accrued interest, EngagePoint owed Brevet approximately $65 million in March 2017.

31. The loans provided that Brevet had security interests in EngagePoint's assets.

32. EngagePoint failed to make monthly payments soon after it accepted the loan from Brevet but Brevet did not foreclose on the loan.

33. EngagePoint CFO Bradley White, who was hired in March 2015, was the point of contact between Brevet and EngagePoint. White was practically the only EngagePoint employee in communication with Brevet, and upon information and belief, was the only person with full knowledge of the financial relationship between EngagePoint and Brevet.

34. After Brevet's initial loan to EngagePoint, Brevet exercised control over the day-to-day operation of EngagePoint as White communicated information to Brevet about EngagePoint's operations and Brevet directed EngagePoint's actions with the threat of calling in the loan or ceasing additional loans.

35. In December 2016, White resigned from his position at EngagePoint and took an executive position at another company that, upon information and belief, was controlled by Brevet.

36. In February 2017, White returned to EngagePoint as the CEO.

*EngagePoint Terminated Odjaghian and Nasta and Entered Severance Agreements with Them*

37. On March 15, 2017, White informed Odjaghian and Nasta that their employment was terminated without notice and without cause because the company could not continue to pay their salaries.

38. EngagePoint terminated two other executives on March 15, 2017.

39. EngagePoint had previously terminated two other executives as a cost-saving measure.

40. Several other executives in the leadership team, including CEO White, Senior Vice President Faiyaz Shikari, Senior Vice President Sonia Lucas, and Senior Vice President Thomas Swider were not terminated.

41. EngagePoint offered Odjaghian and Nasta severance agreements that provided that EngagePoint would pay them their severances and monies owed in exchange for the release of their claims against EngagePoint.

42. Odjaghian and Nasta agreed to the severance agreements.  (Odjaghian's severance agreement is attached as Exhibit 3 and Nasta's severance agreement is attached as Exhibit 4).

43. EngagePoint made one payment pursuant to its agreement to pay Odjaghian and Nasta of approximately $5,000 to each on May 11, 2017.

44. EngagePoint has since materially breached the agreement by failing to provide any further payments pursuant to the severance agreements.

*White Claimed Brevet Foreclosed on its Secured Loans and EngagePoint Stopped Paying Odjaghian and Nasta Pursuant to the Severance Agreement*

45. Then, on June 6, 2017, White emailed Odjaghian and Nasta and informed them that Brevet had foreclosed on its loans to EngagePoint on May 22, 2017.

46. White informed Odjaghian and Nasta that EngagePoint's assets had been sold at a public auction that concluded on June 5 and that the sale did not generate enough assets to pay Brevet's secured loans.

47. Thus, White said, there were not sufficient funds to pay Odjaghian or Nasta the totals they were owed under their severance agreements.

48. EngagePoint has not made any other payments to Odjaghian or Nasta since May 11, 2017.

49. EngagePoint continues to exist, and upon information and belief, continues to have active services contracts with several states including Missouri, Minnesota, and California.

*The Purported Public Auction was a Sham and Part of a Fraud by Brevet, EngagePoint, HHS, and White to Avoid Debts Owed to the Terminated Executives and Other Creditors*

50. The auction of EngagePoint's assets, which included significant ongoing revenue streams from various government and private sector contracts, was supposedly announced on May 27, 2017 and executed on June 5, 2017.

51. The auction was open for six hours, from 10am until 4pm.

52. EngagePoint purported to provide public notice of the auction in New York.

53. None of the executives EngagePoint terminated live in New York City and none knew of the sale until after it had been completed.

54. Upon information and belief, EngagePoint's employees were also unaware of the June 5, 2017 sale until after it had been completed.

55. HHS, a company that shares an address with Brevet and upon information and belief, is controlled by Brevet, bought EngagePoint's assets.

56. A week's notice was not enough time for potential purchasers to value a company of EngagePoint's size or perform due diligence.

8

57. Due diligence for the purchase of a company like EngagePoint would require the putative purchaser to review assets and examine the software products EngagePoint markets and would take months to complete.

### *HHS is a Mere Continuation of EngagePoint*

58. Although EngagePoint and Brevet claimed HHS bought EngagePoint's assets on June 5, 2017, HHS was not formed until June 6, 2017.

59. HHS immediately employed EngagePoint's remaining employees, including the management team of CEO White, Faiyaz Shikari, Sonia Lucas, and Thomas Swider.

60. HHS promoted Shikari, Lucas, and Swider to become Executive Vice Presidents.

61. Upon information and belief, Brevet owns and controls HHS as the two share a corporate office.

62. HHS performs the same business with the same products and customers as did EngagePoint.

63. Former EngagePoint CEO Bradley White was instrumental in both the loan transaction between EngagePoint and Brevet, and upon information and belief, the decision for Brevet to foreclose on EngagePoint and purchase its assets through HHS.

### *Money owed Odjaghian*

64. EngagePoint, Brevet, HHS, and White owe Odjaghian $16,953.09 in deferred wages pursuant to the Maryland Wage Payment and Collection Law.

65. EngagePoint and HHS owe Odjaghian $292,646.09 based on their breach of the separation agreement.

66. Brevet owes Odjaghian $292,646.09 for its violation of Title 9 of the Maryland Commercial Code.

*Money owed Nasta*

67. EngagePoint, Brevet, HHS, and White owe Nasta $71,093.79 in deferred wages pursuant to the Maryland Wage Payment and Collection Law.

68. EngagePoint, Brevet, HHS, and White owe Nasta $257,291.67 as a severance payment that constitute a wage under the Maryland Wage Payment and Collection Law because Nasta's right to the severance payment vested at his termination without cause.

69. EngagePoint, Brevet, HHS, and White owe Nasta $51,562.50 in guaranteed bonus payments that constitute wages under the Maryland Wage Payment and Collection Law because Nasta's right to the guaranteed bonus vested before his termination.

70. EngagePoint and HHS owe Nasta $379,947.86 pursuant to his Separation and Release Agreement with EngagePoint.

71. Brevet owes Nasta $379,947.86 for its violation of Title 9 of the Maryland Commercial Code.

## DEMAND FOR JURY TRIAL

72. Plaintiffs demand a jury trial on all counts.

## CAUSES OF ACTION

### COUNT I
### Maryland Wage Payment and Collection Law

73. Plaintiffs re-allege and reassert every allegation set forth in the paragraphs above as if each were set forth herein.

74. Defendants EngagePoint, Brevet, and White were Plaintiffs' "employers" pursuant to § 3-501 and § 3-502 of the MWPCL.

75. As Plaintiffs' "employers," Defendants were obligated under the MWPCL to pay Plaintiffs all wages due for the work Plaintiffs performed, including all salary, vested severance benefits, and vested bonuses.

76. Defendants failed to pay Plaintiffs all wages due in violation of the MWPCL.

## COUNT II
## Breach of Contract

77. Plaintiffs re-allege and reassert every allegation set forth in the paragraphs above as if each were set forth herein.

78. Plaintiffs entered into valid, written contracts with EngagePoint.

79. Plaintiffs fully performed all of their duties and obligations under their contracts with EngagePoint.

80. EngagePoint materially breached the contracts by failing to pay Plaintiffs in accordance with the terms of the Plaintiffs' employment or severance agreements.

81. As a proximate result of EngagePoint's breach of its contracts with Plaintiffs, Plaintiff Odjaghian is owed $292,646.09 in actual damages and Plaintiff Nasta is owed $379,947.86 in actual damages.

## COUNT III
## Maryland Commercial Law, Title 9

82. Plaintiffs re-allege and reassert every allegation set forth in the paragraphs above as if each were set forth herein.

83. Defendant Brevet was a secured party within the meaning of Maryland Commercial Law, Title 9.

84. Defendant Brevet knew that EngagePoint owed its executives wages and severance pursuant to contract and the Maryland Wage Payment Collection Law.

11

85. Defendant Brevet's sale of EngagePoint's collateral to HHS was not commercially reasonable.

86. As a proximate result of Brevet's violation of Md. Code, Commercial Law § 9-610, Plaintiff Odjaghian is owed $292,646.09 in actual damages and Plaintiff Nasta is owed $379,947.86 in actual damages.

WHEREFORE, Defendants are liable to Plaintiffs under Count I for three times (3x) the amount of all unpaid wages that Defendants failed to pay Plaintiffs, for attorney's fees, costs, and expenses of this action incurred as a result of Defendants' failure to pay Plaintiffs what was legally owed to Plaintiffs, pre-judgment and post-judgment interest as provided for by law, and for such other legal and equitable relief from Defendants' unlawful and willful conduct as the Court deems proper.

Defendants EngagePoint and HHS are liable to Plaintiffs under Counts II and III for actual and consequential damages; reasonable attorneys' fees and costs; pre-judgment and post-judgment interest as provided for by contract and law; and such other relief at law or in equity to which Plaintiff is justly entitled.

RESPECTFULLY SUBMITTED,

Alan Lescht & Associates, P.C.

By: _____
Rani Rolston
1825 K Street, N.W., Suite 750
Washington, D.C. 20006
T: 202.463.6036
F: 202.463.6067

                                              rani.rolston@leschtlaw.com
                                              *Counsel for Plaintiffs*

### Rule 1-313 Certification

I, Rani Rolston, certify under Rule 1-313 that I am admitted to practice law in the State of Maryland.

                                              _____
                                              Rani Rolston