# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

EDWARD ODJAGHIAN and
GORDON NASTA,

      Plaintiffs,

   v.

ENGAGEPOINT, INC.,
HHS TECHNOLOGY GROUP, LLC,
BREVET CAPITAL
MANAGEMENT, LLC, and
BRADLEY WHITE,

      Defendants.

Civil Action No. 1:18-cv-151-JKB

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO DISMISS

# TABLE OF CONTENTS

Table of Contents.................................................................................................. ii

Table of Authorities............................................................................................. iii

Introduction ...........................................................................................................1

Statement of Facts.................................................................................................3

Legal Standard.......................................................................................................7

Argument................................................................................................................9

I.     The Wage Claim Must be Dismissed Against Brevet, HHS, and White Because None Are or Were The Executives' Employers. ................. 9

       A.    The Executives' Employer Was EngagePoint. ................................ 11

       B.    Brevet Was Not, and Is Not, the Executives' Employer. .................. 11

       C.    White Was Not, and Is Not, the Executives' Employer................... 13

       D.    HHS Was Not, and Is Not, the Executives' Employer, nor Is It the Successor to the Executives' Employer.............................. 14

II.    The Contract Claim Must Be Dismissed Against HHS Because It Is Not and Was Not a Party to Any Agreements with Plaintiffs. ................................................................................................. 19

III.   The Foreclosure Claim Must Be Dismissed Because It Does Not State a Cause of Action Available to the Executives. ................................ 20

IV.   All Claims Against Brevet Must Be Dismissed for Lack of Personal Jurisdiction. ................................................................................ 21

Conclusion...........................................................................................................23

# TABLE OF AUTHORITIES

## Cases

*Acad. of IRM v. LVI Envtl. Servs., Inc.*, 687 A.2d 669 (1997) ............ 15, 16, 18, 19

*Ashcroft v. Iqbal*, 556 U.S. 66 (2009) .................................................................. 8

*Auto. Trade Ass'n of Md. v. Harold Folk Enters., Inc.*, 301 Md. 642
    (1984) .................................................................................................. 10

*Baltimore Luggage Co. v. Holtzman*, 80 Md. App. 282 (1989) ................ 15, 16, 17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................... 7, 8

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ....................................... 23

*Campusano v. Lusitano Constr. LLC*, 208 Md. App. 29 (2012) ............... 10, 13, 14

*Carollo v. Fed. Debt Assistance Ass'n, LLC*, 2017 U.S. Dist. LEXIS
    156074 (D. Md. 2017) .......................................................................... 13, 14

*Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) ................................................... 23

*Depew v. Mobile Dredging & Pumping Co.*, 2017 U.S. Dist. LEXIS
    58700 (D. Md. 2017) ...................................................................... 11, 12, 13

*Francis v. Giacomelli*, 588 F.3d 186 (4th Cir. 2009) ......................................... 3, 8

*Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915 (2011) ................. 22, 23

*Grayson v. Anderson*, 816 F.3d 262 (4th Cir. 2016) .......................................... 8, 9

*Hanson v. Denckla*, 357 U.S. 235 (1958) ............................................................ 23

*In re John's Bean Farm of Homestead, Inc.*, 378 B.R. 385 (Bankr. S.D.
    Fla. 2007) ................................................................................................. 5

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ............................................. 23

*Mackall v. Zayre Corp.*, 293 Md. 221 (1982) ..................................................... 10

*Macsherry v. Sparrows Point, LLC*, 2014 U.S. Dist. LEXIS 122153 (D. Md. 2017) ................................................................................. 10

*Nissen Corp. v. Miller*, 323 Md. 613 (1991).......................................... 15

*Old W. Annuity & Life Ins. Co. v. Apollo Grp.*, No. 5:03-CV-354-OC-10GRJ, 2008 WL 2993958 (M.D. Fla. Aug. 1, 2008) ................................ 19

*Pavlovic v. Univ. of Md. Balt. County*, 2013 U.S. Dist. LEXIS 125802 (D. Md. Sept. 3, 2013) ................................................................. 8

*Pinsky v. Pikesville Rec. Council*, 214 Md. App. 550 (2013) ............................ 13

**Statutes**

Federal Rule of Civil Procedure 12 ............................................7, 8, 9, 24

Md. COMMERCIAL LAW Code Ann. § 9-625 ............................................23, 24

Md. COMMERCIAL LAW Code. Ann. § 9-610 ................................................ 23

Md. LABOR AND EMPLOYMENT Code Ann. § 3-501 ................................... 10

Md. LABOR AND EMPLOYMENT Code Ann. § 3-502 ...................................... 9

Md. LABOR AND EMPLOYMENT Code Ann. § 3-505 ...................................... 9

Md. LABOR AND EMPLOYMENT Code Ann. § 3-507.2 ................................. 10

**Treatises**

11 Part II Anderson U.C.C. § 9-625:7 [Rev] (3d ed.).......................................... 24

15 W. Fletcher, Cyclopedia of the Law of Private Corporations § 7122 (rev. perm. ed. 1983) (cum. supp. 1988) .................................................... 18

Defendants HHS Technology Group, LLC (**HHS**), Brevet Capital Management, LLC (**Brevet**), and Bradley White (**White**) (together, **Moving Defendants**), by and through their undersigned counsel, hereby file this Memorandum of Law in Support of their Motion to Dismiss.   All Moving Defendants seek dismissal under Rule 12(b)(6) for failure to state a claim.   In addition, Defendant Brevet seeks dismissal under Rule 12(b)(2) for lack of personal jurisdiction.

## INTRODUCTION

This is an action by two former executives (**Plaintiffs** or **Executives**) who wish to be paid the compensation allegedly owed to them by their former employer, EngagePoint, Inc. (**EngagePoint**).   However, they have largely sued the wrong Defendants.   The party that owes them their salaries and deferred bonuses is EngagePoint itself.   But because EngagePoint has been insolvent for some time, the Executives have sued several other Defendants:   As alleged in the Complaint, Brevet was a secured lender to EngagePoint who, also owed money by EngagePoint, eventually foreclosed on many of EngagePoint's assets.   HHS is the entity that received those assets in the foreclosure sale.   And Defendant White is the former CEO of EngagePoint, who HHS now has hired as CEO.

None of these Moving Defendants were the Executives' employers. Nor did any of them allegedly have any contracts with the Executives. And as a matter of law, none of them are liable based on the Executives' allegations.

In Count I—the **Wages Claim**—the Executives allege that all Defendants are liable for failure to pay their salaries and bonuses under the Maryland Wage Payment and Collection Law (**MWPCL**). But MWPCL claims lie only against employers and employers' successors. None of the Moving Defendants were the Executives' employers. Nor is HHS a successor to EngagePoint. (*See* Section I.)

In Count II—the **Contract Claims**—the Executives allege that Defendant EngagePoint breached their employment and severance contracts. They claim that HHS is derivatively liable as a successor to EngagePoint. Again, HHS is no successor to EngagePoint. (*See* Section II.)

Finally, in Count III—the **Foreclosure Claim**—the Executives allege that Defendant Brevet[1] conducted its foreclosure on EngagePoint's assets too quickly, and therefore not in a commercially reasonable manner. The Moving Defendants dispute the Executives' characterization of the foreclosure, but even if

---

[1] Although the Executives allege that Defendant Brevet conducted the foreclosure too quickly, and one allegation alleges that Brevet is liable on Count, their prayer for relief asserts this Count only against Defendant HHS. Their ambiguity is immaterial, as no cause of action lies against either Defendant.

there were a defect in the foreclosure, the Executives have asserted no cause of action against the Defendants.  Under the law they invoke, there simply is no cause of action available to plaintiffs who are not debtors, obligors, or other secured parties. (*See* Section III.)

In addition, Defendant Brevet is entitled to dismissal because the Court lacks jurisdiction over it.  Plaintiff appears to have misnamed it as a defendant in this action, as it was not a party to the transactions underlying the Complaint. (*See* Section IV.)

For these reasons, the Moving Defendants respectfully submit that the Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

Except where otherwise stated, Moving Defendants assume, without conceding, that allegations in the Executives' Complaint are true.  *See Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).

Defendant EngagePoint was a software company that sold software to government entities and private companies.  (Compl. ¶ 19.)  Plaintiff Odjaghian was an employee of EngagePoint from March 1, 2007, and Plaintiff Nasta was an employee of EngagePoint from November 2, 2015.  (Compl. ¶¶ 20–21.)  Both were executives within the company.  (Compl. ¶¶ 25–29.)

In 2013, EngagePoint began to experience financial difficulties. (Compl. ¶ 23.) EngagePoint therefore took actions aimed at improving its financial condition. For example, Plaintiff Odjaghian agreed to defer his 2013 executive bonus. (Compl. ¶ 29.) But to fund its operations, EngagePoint needed more cash, and therefore sought financing. According to the Complaint, EngagePoint sought out Brevet.

In reality, Brevet was not a party to the transactions alleged in the Complaint. (Bunge Decl. ¶ 2.) Brevet is a firm incorporated in Delaware with its principal place of business in New York. (Bunge Decl. ¶¶ 4, 5.) It has no office or other presence in Maryland; it does not have any business registrations or other licenses under Maryland law or the law of any subdivision of Maryland; and it does not directly hold or own any assets in Maryland, and is not aware of any indirect interests in assets in Maryland. (Bunge Decl. ¶¶ 6–8.) Brevet was not the entity that extended or foreclosed on the loan underlying the Complaint. (Bunge Decl. ¶ 2.)

According to the Complaint, however, Brevet gave EngagePoint a $20 million loan in December 2014. (Compl. ¶¶ 23–24.) Thereafter, EngagePoint periodically received additional loans from Brevet that resulted in EngagePoint owing Brevet approximately $65 million as of March 2017. (Compl. ¶ 30.) To secure these loans, EngagePoint gave Brevet security interests in EngagePoint's assets. (Compl. ¶ 31.) Brevet put the public on notice of its security interests on

EngagePoint's assets through a UCC filing on Florida's publicly accessible UCC registry website.  (Berger Decl., Ex. A.[2])

From March 2015 to December 2016, the main point of contact between EngagePoint and Brevet was Bradley White, then EngagePoint's CFO. (Compl. ¶ 33.)   According to the Complaint, White communicated information about EngagePoint's operations to Brevet, while Brevet used the threat of calling in the loans or ceasing additional loans to direct EngagePoint's actions.  (Compl. ¶ 34.) The Complaint does not, however, provide any detail or facts about these supposed communications and directions.  Nor does the Complaint allege that Brevet had any legal right to control EngagePoint's activities, or that Brevet's alleged instructions represented anything other than a creditor negotiating with a debtor at arms-length.

After three years of financial difficulties and cash flow problems, in April 2016, EngagePoint asked several executives to agree to defer their salaries. (Compl. ¶ 25.)  Plaintiffs Nasta and Odjaghian were two of those executives, and both agreed to do so.  In exchange for agreeing to defer his salary, Nasta agreed to accept class C-1 equity shares in EngagePoint in an amount equal to his deferred

---

[2]    The Court may take notice of public Florida's UCC registry.  *In re John's Bean Farm of Homestead, Inc.*, 378 B.R. 385, 395 n.18 (Bankr. S.D. Fla. 2007).

salary.  (Compl. ¶ 27.)  The Complaint does not allege that either Odjaghian or Nasta took any efforts to secure the debts that EngagePoint owed them.

According to the Complaint, in March 2017, Defendant White (by then CEO of EngagePoint) informed the Executives and two other executives that EngagePoint could not afford to pay their salaries and therefore would terminate their employment.  (Compl. ¶ 37.)  Defendant EngagePoint offered the Executives severance agreements that provided that EngagePoint would pay the Executives their severances and monies owed in exchange for release of their claims against EngagePoint.  (Compl. ¶ 42.)  The Executives allege that EngagePoint made only one payment to each of the Executives for approximately $5,000 on May 11, 2017.  (Compl. ¶ 43.)

The measures were not enough to restore EngagePoint's financial condition.  As a result of EngagePoint's failure to make payments on the Brevet loans, on May 22, 2017, Brevet foreclosed on many of EngagePoint's assets securing those loans.  Brevet conducted a public auction of those assets that was announced on May 27, 2017, and held on June 5, 2017.  (Compl. ¶ 50)  According to the Complaint, HHS purchased those assets at the auction.  (Compl. ¶¶ 45–55.)  Nonetheless, the auction did not generate enough assets to pay all of Brevet's loans, and there were not enough funds to pay Odjaghian or Nasta anything further.  (Compl. ¶¶ 46–47.)

HHS did not exist until June 6, 2017, months after Odjaghian and Nasta ceased to be employed by EngagePoint.  (Compl. ¶ 58.)  After the foreclosure, HHS hired some of EngagePoint's employees, including CEO White.  (Compl. ¶ 59.) According to the Complaint, HHS performs the same business with the same products and customers as EngagePoint.  (Compl. ¶ 62.)  At the same time, according to the Complaint, EngagePoint continues to exist and continues to have active service contracts with several states including Missouri, Minnesota, and California. (Compl. at ¶ 49.)

## LEGAL STANDARD

*Rule 12(b)(6).*  To survive a Motion to Dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007) .  As the Fourth Circuit has explained, "To survive a motion  to dismiss pursuant to Rule 12(b)(6), [Plaintiffs'] '[f]actual allegations must be enough to raise a right to relief above the speculative level,' thereby 'nudg[ing] [their] claims across the line from conceivable to plausible.'" *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013), *quoting Twombly,* 550 U.S. at 555 and 570.  Along these same lines, in *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009),  the Fourth Circuit explained:

> To emphasize the Federal Rules requirements for stating claims that are warranted and therefore form a plausible

> basis for relief, the Supreme Court has held that a complaint must contain 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'  *Twombly*, 550 U.S. at 555.  To discount such unadorned conclusory allegations, 'a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled 'to the assumption of truth."  *Ashcroft v. Iqbal*, 556 U.S. 66, 679 (2009).  This approach recognizes that 'naked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.'  *Twombly*, 550 U.S. at 557 (internal quotation marks omitted).

As this Court has previously noted, "conclusory statements or a formulaic recitation of the elements of a cause of action will not suffice."  *Pavlovic v. Univ. of Md. Balt. County*, 2013 U.S. Dist. LEXIS 125802, *4 (D. Md. Sept. 3, 2013) (internal quotations omitted).

  ***Rule 12(b)(2).***  To survive a Motion to Dismiss under Rule 12(b)(2), a plaintiff bears the burden of establishing personal jurisdiction over a defendant. *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016).  Provided that the Court affords all parties a fair opportunity to present evidence and argument, it may decide a Rule 12(b)(2) motion based on facts beyond those alleged in the pleadings.  *Id*.  In such a circumstance, the plaintiff must establish jurisdiction based on the preponderance of the evidence.  *Id.*

# ARGUMENT

## I.   THE WAGE CLAIM MUST BE DISMISSED AGAINST BREVET, HHS, AND WHITE BECAUSE NONE ARE OR WERE THE EXECUTIVES' EMPLOYERS.

Although EngagePoint may be liable to the Executives for lost wages, Moving Defendants are not, for the simple reason that they were never the Executives' employers.  Under the MWPCL, it is "employers" who are required to "set regular pay periods," pay employees pursuant to these regular pay periods, and to "pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated."  Md. LABOR AND EMPLOYMENT Code Ann. §§ 3-502, 3-505.  And it is "employers" who may liable to the employee for failure to pay wages.   Md. LABOR AND EMPLOYMENT Code Ann. § 3-507.2.

The MWPCL defines "employer" as "any person who employs an individual in the State or a successor of the person."  *Id.* at § 3-501(b).  As a general legal principal, "[t]he decisive test in determining the existence of an employer-employee relationship is the right of the employer to control and direct the employee in the performance of the work and in the manner in which the work is to be done."  *Auto. Trade Ass'n of Md. v. Harold Folk Enters., Inc.*, 301 Md. 642, 660 (1984) (citing *Mackall v. Zayre Corp.*, 293 Md. 221, 230 (1982)); *see also Macsherry v.*

*Sparrows Point, LLC*, 2014 U.S. Dist. LEXIS 122153, *86 (D. Md. 2017).

Maryland's Court of Special Appeals has held that a version of the economic reality

test should be applied to the determination of employer status under the MWPCL.

*Campusano v. Lusitano Constr. LLC*, 208 Md. App. 29, 38 (2012).   Specifically, the

*Campusano* Court applied the economic reality test to examine "whether the alleged

employer (1) had the power to hire and fire the employees, (2) supervised and

controlled employee work schedules or conditions of employment, (3) determined

the rate and method of payment, and (4) maintained employment records."   *Id.* at

39–40 (internal quotations omitted).   The Court further noted, "[t]he four enunciated

factors of 'control' are not to be applied mechanistically, and their general purpose

must be understood as ultimately assigning responsibility under the law."   *Id.* at 40

(emphasis in original).

        Based on the Complaint's allegations, neither Brevet, White, nor HHS

fits this definition of "employer."    Brevet was an arms'-length lender to

EngagePoint.   White was one executive of the employer.   HHS did not even exist at

the time that the Executives were employed by EngagePoint, and is not a successor

to EngagePoint.   None, then, can be held liable for the Executives' unpaid wages.

## A.     The Executives' Employer Was EngagePoint.

As an initial matter, there is no dispute as to the entity that actually employed the Executives: EngagePoint, Inc.   (Compl. ¶ 2 ("Plaintiffs were employees of EngagePoint . . . .").)  The Executives do not allege otherwise.

## B.     Brevet Was Not, and Is Not, the Executives' Employer.

In contrast, the Executives do not allege that Brevet was ever the Executives' formal employer.  Rather, the Executives imprecisely allege that Brevet was a "joint" employer by virtue of its extension of loans to EngagePoint.  (Compl. ¶¶ 15, 34.)  But Maryland law does not extend the definition of "employer" to third-parties to hold them liable for an employer's conduct, even when the corporate relationships between employer and third-party are much closer than they are here. *See Depew v. Mobile Dredging & Pumping Co.*, 2017 U.S. Dist. LEXIS 58700, *33–35 (D. Md. 2017) (holding that a parent company was not the employer of its subsidiary's employees, even where it produced employee policies and guidelines, since the parent did not actually exert any control over the employee).

Simply put, the Complaint fails to assert any facts at all that would support the claim that Brevet was the Executives' "employer."  There are no allegations that Brevet exercised control over the Executives and the terms and conditions of their employment with EngagePoint.  To the contrary, the Complaint confirms that Brevet was a third-party to the Executives.  (Compl. ¶ 33 ("White was

practically the only EngagePoint employee in communication with Brevet.").)  The only substantive allegation with respect to Brevet, which is repeated several times, is that it exercised "control over EngagePoint's business through its grant or denial of loans that kept EngagePoint operating."  (Compl. ¶ 2; see also, *id.* ¶ 34.)  The conclusory allegation that Brevet exercised operational control is devoid of any allegation that Brevet's purported control actually affected the terms and conditions of anyone's employment, let alone the employment of the Executives.  Specifically, the Executives do not allege that Brevet "establish[ed] any employee practices for [EngagePoint] . . . create[ed] or impose[d] any overtime compensation policies for [EngagePoint] . . . control[led]  the scheduling of [EngagePoint's] employees . . . [provided] accounting or bookkeeping for [EngagePoint] . . . [had] involvement in [EngagePoint's] payroll . . . [or had] possession of any subsidiary employees' time sheets, including Plaintiffs' time sheets." *Depew*, 2017 U.S. Dist. LEXIS 58700 at *34–35. Similar to *Depew*, which presented a stronger case for the plaintiff because the defendant in *Depew* owned the formal employer and "had the authority to hire and fire managers and assistant managers," the absence of specific facts pertaining to control of employment precludes a finding that Brevet could be an employer under the MWPCL.  The fact that EngagePoint operated under "the threat of [Brevet] calling in the loan or ceasing additional loans" is not evidence of employer status, but rather typical of any commercial creditor or financier and exhibits less control

than the employer at issue in Depew.  (Compl. ¶ 34.)  In sum, there are no facts alleged that would even raise a question as to whether Brevet was the Executives' employer.

### C.     White Was Not, and Is Not, the Executives' Employer.

Nor was White the Executives' employer.  In applying the economic reality test as set forth in *Campusano*, courts have routinely rejected claims that typical supervisors, executives, or directors have the sort of control over employees that they become "employers" subject to personal liability.  *See, e.g.*, *Campusano*, 208 Md. App. at 40 (holding that the existence of some "supervisory tasks are not sufficient to make [the appellee] personally liable for appellants' wages); *Pinsky v. Pikesville Rec. Council*, 214 Md. App. 550, 588–89 (2013) (holding that members of the Board of Directors were not employers); *Carollo v. Fed. Debt Assistance Ass'n*, LLC, 2017 U.S. Dist. LEXIS 156074, *10–11 (D. Md. 2017) (granting Motion to Dismiss as to a CFO "whose duties include the calculation and payment of wages" because she was not alleged to have sufficient actual control).

There are no allegations (nor could there be) that White exercised control over the terms and conditions of the Executives' employment with EngagePoint such that he could be personally liable for their wages as their "employer."  Plaintiff alleges that he was simply one member of EngagePoint's management team.  (Compl. ¶ 59.)  Although White is alleged to have "informed"

the Executives that their employment was terminated, providing notice cannot establish White exercised enough control to be an employer.  (Compl. ¶ 37; *see also*, *id*. at ¶¶ 45–49 (Plaintiffs allege that White provided them with additional information, but allege that EngagePoint took action).)   The performance of "supervisory tasks are not sufficient to make" White an employer.  *Campusano*, 208 Md. App. at 40.  Claims against executives such as White must be dismissed where "Plaintiffs do not allege any facts regarding [the executive's] control over hiring, firing, work schedules, or employment records.  Without an alleged ownership interest or control over the employment relationship beyond the payment of wages, the Plaintiffs have not made out a plausible claim that [the executive] is an 'employer.'"  *Carollo*, 2017 U.S. Dist. LEXIS 156074 at *11.  Simply put, there are no allegations that White owned EngagePoint nor that he had control over the Executives' employment relationship beyond keeping the Executives informed.

### D.    HHS Was Not, and Is Not, the Executives' Employer, nor Is It the Successor to the Executives' Employer.

The situation for HHS is different, but the result is the same.  HHS did not even exist until *after* the termination of the Executives' employment relationship with EngagePoint (Compl. ¶ 5), so it could not possibly be the Executives' actual employer.  The Executives instead allege that HHS is a corporate successor to EngagePoint, and therefore liable for EngagePoint's conduct.  The Executives' allegations fail to support the claim.

A bedrock rule of commercial and corporate law is that a corporation that acquires assets is not liable for the debts and liabilities of the seller. *Baltimore Luggage Co. v. Holtzman*, 80 Md. App. 282, 290 (1989). There are four "successor liability" exceptions to this general rule. *Id.* Of pertinence here, the Executives allege that HHS is a "mere continuation" of EngagePoint. (Compl. ¶¶ 58–63). Under the mere continuation exception, a creditor of a defunct corporation may recover from a successor corporation that is "substantially the same" as the defunct corporation. *Id.* at 297. Maryland courts draw a distinction, however, between a mere continuity of *enterprise* and a true continuity of *entity*. *Acad. of IRM v. LVI Envtl. Servs., Inc.*, 687 A.2d 669, 677–78 (1997). Continuity of enterprise refers to continuation of business operations and activities. *Nissen Corp. v. Miller,* 323 Md. 613,618 (1991); *see also Baltimore Luggage Co.,* 80 Md. App. at 296 n.10. Continuity of entity, on the other hand, refers to an actual or effective continuation of the corporate entity, such as through continuation of directors, management, shareholder interest, and ownership interest. *Nissen Corp.,* 323 Md. at 620. Maryland courts have affirmed that, to the extent Maryland law recognizes the mere continuity exception,[3] continuity of *entity* is the heart of it. Continuity of enterprise

---

[3]     Strictly speaking, the Maryland Court of Special Appeals did not decide whether Maryland law recognizes the "mere continuation" theory in *Baltimore Luggage Co.,* 80 Md. App. at 291, 296. The Court acknowledged that the exception is absent in Maryland case law. *Id.* Although the Court found that the "policy" is nonetheless implicit in Maryland law, it did so only

standing alone is not enough.  *Acad. of IRM*, 687 A.2d at 677–78; *Baltimore Luggage Co.,* 80 Md. App. at 297 & n.10.

The Executives' successor liability bid fails because the Executives merely allege continuity of enterprise, not continuity of entity.  The two traditional and most important indicia of continuation of entity are "common officers, directors, and stockholders; and only one corporation in existence after the completion of the sale of assets."  *Id.* (quoting 15 W. Fletcher, Cyclopedia of the Law of Private Corporations § 7122 (rev. perm. ed. 1983) (cum. supp. 1988).  The Executives allege that HHS conducts "the same business with the same products and customers as did EngagePoint" (Compl. ¶ 62), but this is typical of any asset sale and does not make a purchaser a mere continuation of a seller.  The Executives also allege only that HHS "employed EngagePoint's remaining employees, including the management team, and promoted certain former employees." (Compl. ¶ 59.)  Again, nothing remarkable here.  By contrast, the Executives do not, and could not, allege continuity of stockholders.  In other words, ownership has changed completely.  Nor do the Executives allege that only one corporation remains in existence after the sale of assets.  Quite the contrary, the Executives allege that EngagePoint continues to exist and continues to have active service contracts with several states.  (Compl. at ¶ 49.)

---

in dicta, as the Court ultimately found that "mere continuation" was not present in that case.  *Id.* at 296–99.

*Baltimore Luggage Co.* illustrates why successor liability does not lie in this case, where there is no continuity of ownership and EngagePoint remains in existence. Like the present case, *Baltimore Luggage Co.* was a suit for recovery of benefits due to an employee. 80 Md. App. at 284, 297 & n.10. The employee's actual employer had since sold its assets to a new company, and the employee sued the new company on the ground that it was a "mere continuation" of the employer. The Court rejected the contention. As an initial matter, the court observed that even if a loosening of the "mere continuation" theory made sense for the protection of consumers, it made little sense for the protection of employees. *Id*. at 296 n.10. The Court then found the facts insufficient to establish continuity of entity. It noted, among other things, that there was substantially (but not entirely) different ownership between the employer and the new corporation, and that the employer survived as an entity after the asset sale. *Id*. at 298–99. These considerations dictate the same result in the present case, where Plaintiff pleads no continuity of ownership and that the alleged predecessor corporation continues to exist.

*Academy of IRM v. LVI Environmental Services, Inc.*, 687 A.2d 669, further demonstrates why HHS, as the recipient of EngagePoint's assets in a foreclosure sale, cannot be considered EngagePoint's successor. That case considered "[w]hether successor liability may be imposed where the 'successor' has acquired the assets of the debtor through foreclosure of bona fide security interests

purchased for value by the 'successor' from the original lenders." *Id.* at 671. A debtor company had encumbered all of its assets as collateral for several loans, which were later consolidated. *Id.* at 673. When the debtor defaulted, it sold all of that collateral to an assignee of its creditor in lieu of foreclosure. (This was deemed a "friendly foreclosure." *Id.*) In exchange, the creditor credited the amounts received against the debtor's obligation. *Id.* The alleged successor continued the business of the debtor, had the same employees, had many of the same officers, and continued to use the debtor's trade name. *Id.* at 443–44, 453. A Maryland circuit court found that assignee who received the assets was a successor of the debtor on the ground that it continued the same business, had the same employees, had many of the same officers, and continued to use the trade name of the debtor. *Id.* at 451– 52. But the Maryland Court of Appeals reversed. It iterated Maryland's rule that only continuity of entity, as opposed to continuity of enterprise, can give rise to successor liability. *Id.* Applying that rule, the Court observed that there was no continuity of ownership between the debtor and the alleged successor. *Id.* at 454. But perhaps more important was the nature of the asset sale: it was a foreclosure of bona fide security interests in collateral. *Id.* The Court therefore concluded that "[u]nder the facts of this case successor entity liability does not lie." *Id.* Here, too, HHS acquired EngagePoint's assets in foreclosure, and Plaintiffs do not allege any

continuity of ownership.  *Academy of IRM* therefore dictates dismissal of claims, such as the Wage Claim, premised on HHS's alleged successor liability.[4]

\*     \*     \*

In short, EngagePoint is the proper defendant of the Executives' Wage Claim, not the Moving Defendants.  Even assuming the Complaint's allegations to be true, Brevet was never more than lender to the Executives' employer; a third-party to the Executives.  White was never more than one executive within the management team.  And HHS has never been more than the acquirer—*in foreclosure*—of many of EngagePoint's assets.  None of the Moving Defendants were employers, and the Wage Claim against them must be dismissed.

## II.   THE CONTRACT CLAIM MUST BE DISMISSED AGAINST HHS BECAUSE IT IS NOT AND WAS NOT A PARTY TO ANY AGREEMENTS WITH PLAINTIFFS.

The Executives' Contract Claim against HHS must be dismissed because HHS is not party to any of the contracts with the Executives.[5]  Nor could it

---

[4]   The result is the same under the law of Florida, where the security interests in EngagePoint's assets were registered.  *See Old W. Annuity & Life Ins. Co. v. Apollo Grp.*, No. 5:03-CV-354-OC-10GRJ, 2008 WL 2993958, at \*11 (M.D. Fla. Aug. 1, 2008), *aff'd*, 605 F.3d 856 (11th Cir. 2010) ("where it is clear that [the successor] ultimately obtained [property of the predecessor] in satisfaction of an executed and valid debt—i.e. for consideration—the Court cannot conclude that [the successor] was a 'mere continuation' of [the predecessor].").

[5]   According to the Complaint's prayer for relief, Plaintiffs do not assert the Contract Claim against Brevet or White.

be.  As the Executives themselves allege, HHS did not even exist until *after* the

termination of the Executives' employment relationship with EngagePoint (Compl.

¶ 5), so it could not possibly be a counterparty to any of the employment or severance

agreements cited.[6]  Instead, the Executives allege that HHS is a corporate successor

to EngagePoint, and therefore liable for EngagePoint's conduct.  But the Executives'

allegations fail to support a successor liability theory for the reasons described above

in Section I.D.   HHS therefore cannot be liable on a contract entered into by

EngagePoint, and the Contract Claim against HHS must be dismissed.

## III.   THE FORECLOSURE CLAIM MUST BE DISMISSED BECAUSE IT DOES NOT STATE A CAUSE OF ACTION AVAILABLE TO THE EXECUTIVES.

The Executives' Foreclosure Claim against either Brevet or HHS fails

because Plaintiffs simply fail to assert a valid cause of action.[7]  Plaintiffs merely

claim that the foreclosure of EngagePoint's assets was not conducted in compliance

with Maryland's Commercial Law Code § 9-610.[8]   That provision governs the

---

[6]     Plaintiffs do not, and could not, allege any novation by HHS of the employment agreements or severance agreements.

[7]     As noted above, the Complaint is internally inconsistent with regard to whether this Count is asserted against Brevet or HHS. (*Compare* Compl. ¶¶ 6, 82–86, and the unnumbered flush paragraphs following ¶¶ 82–86.)

[8]     The Moving Defendants do not, at this time, take any position on whether Maryland's Commercial Law, as opposed to the commercial law of another state, governs to the foreclosure of EngagePoint's assets.

conduct of foreclosures, but it does not provide a cause of action for a foreclosure allegedly conducted in violation of its requirements.

Although the Executives do not cite it, there is another provision of Article 9 of Maryland's Commercial Law that governs the remedies for breaches: Md. COMMERCIAL CODE Ann. § 9-625, titled "Remedies for secured party's failure to comply with title."  Section 9-625(b) creates a damages cause of action against a secured lender who violates any portion of Article 9.  *Id.*  However, that provision states that it is subject to Section 9-625(c), which identifies the types of parties who may have standing to claim damages: debtors, other obligors on a debt, and other parties with security in or liens on the foreclosed collateral.  *Id.*; *see also id.* official cmt. 3 ("Subsection (c) identifies who may recover under subsection (b)."); 11 Part II Anderson U.C.C. § 9-625:7 [Rev] (3d ed.) ("The persons entitled to recover their actual damages include the debtor, obligor or other person holding a security interest in, or lien on, the collateral at the time the secured party breached its duties.").  The Executives fall into none of those categories.

## IV.   ALL CLAIMS AGAINST BREVET MUST BE DISMISSED FOR LACK OF PERSONAL JURISDICTION.

The Complaint should be dismissed as to Brevet under Rule 12(b)(2) because the Court lacks personal jurisdiction over Brevet, which has no Maryland presence and was not a party to any transaction or event at issue in this case.  To establish personal jurisdiction, a plaintiff must demonstrate facts sufficient to

establish either (a) general jurisdiction, which permits a plaintiff to pursue any and all claims regardless of where or how they arise, or (b) specific jurisdiction, which permits a plaintiff to pursue only claims specifically relating to the defendant's in-forum activities. *See Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011). Neither is present here.

General jurisdiction is lacking because Brevet neither is incorporated in Maryland nor has its principal place of business in Maryland. (Bunge Decl. ¶¶ 4, 5.) For that matter, Brevet has no office or other presence in Maryland; it does not have any business registrations or other licenses under Maryland law or the law of any subdivision of Maryland; and it does not directly hold or own any assets in Maryland, and is not aware of any indirect interests in assets in Maryland. (Bunge Decl. ¶¶ 6–8.) But to proceed under a general jurisdiction theory, the plaintiff must establish that a defendant's contacts with the forum "are so continuous and systematic as to render [the defendant] essentially at home in the forum state." *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014); *Goodyear*, 564 U.S. at 919. In *Daimler* the Supreme Court explained that in all but exceptional circumstances, corporations are "at home" only in their "place of incorporation [or] principal place of business". *See Daimler*, 134 S. Ct. at 761 n.19. The Court therefore cannot exercise general jurisdiction over Brevet.

By contrast, to establish specific jurisdiction, the plaintiff must establish that the defendant purposely "avail[ed] itself of the privilege of conducting activities within the forum . . . thus invoking the benefits and protections of its laws" and that the plaintiff's cause of action arises out of those same activities. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 n.18 (1985).  Here, however, Brevet is not the entity that extended financing to EngagePoint, that was involved in administering the loan to EngagePoint, or that foreclosed on the EngagePoint loan.  (Bunge Decl. ¶ 2.)  It had no interactions with EngagePoint or the Plaintiffs whatsoever.  (Bunge Decl. ¶ 2.)

Accordingly, the Court must dismiss all claims against Brevet with prejudice.

## CONCLUSION

For the foregoing reasons, the Moving Defendants respectfully submit that the Complaint should be dismissed as against them with prejudice.

Dated:          March 2, 2018

                              By:  */s/ Russell B. Berger*

                              **OFFIT KURMAN, P.A.**

                              Howard Kurman (Bar No. 02831)
                              Russell B. Berger (Bar No. 28512)
                              300 East Lombard Street, Suite 2010
                              Baltimore, Maryland 21202
                              Phone: 410-209-6417
                              Fax: 410-209-6435
                              Email: hkurman@offitkurman.com

                              **FRESHFIELDS BRUCKHAUS
                              DERINGER US LLP**

                              Timothy P. Harkness (*pro hac* pending)
                              Peter Jaffe (*pro hac* pending)
                              601 Lexington Avenue, 31st Floor
                              New York, New York 10022
                              Telephone: 212-277-4000
                              Fax: 212-277-4001
                              Email:
                              timothy.harkness@freshfields.com,
                              peter.jaffe@freshfields.com

                              *Attorneys For Defendants
                              HHS Technology Group, LLC;
                              Brevet Capital Management, LLC; and
                              Bradley White*