# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **EDWARD ODJAGHIAN, et al.,** | * | |
| Plaintiffs, | * | |
| v. | * | CIVIL NO. JKB-18-0151 |
| **ENGAGEPOINT, INC., et al.,** | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Edward Odjaghian and Gordon Nasta ("Plaintiffs") filed suit against their former employer, EngagePoint, Inc., as well as HHS Technology Group, LLC, Brevet Capital Management, LLC, and Bradley White ("Defendants"). Plaintiffs allege that each defendant is jointly and severally liable to them for unpaid wages under the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann. Labor & Emp't § 3-501, *et seq.* In addition, Plaintiffs allege that EngagePoint breached its employment contracts with them. Finally, Plaintiffs allege that Brevet Capital violated Maryland Commercial Law Code § 9-610, which governs the conduct of foreclosures. Now pending before the Court is Defendants' Motion to Dismiss Plaintiffs' Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). (ECF No. 7.) The Motion has been briefed (ECF Nos. 7-1, 17, and 18) and no hearing is required, *see* Local Rule 105.6 (D. Md. 2016). For the reasons set forth below, Defendants' Motion will be GRANTED.

## I. Background[1]

Plaintiffs were formerly employed as executives by defendant EngagePoint, a healthcare technology company in Calverton, Maryland. (Compl., ECF No. 1 ¶ 2, 9.) Mr. Odjaghian was employed by EngagePoint from March 1, 2007, through March 15, 2017. (*Id.* ¶ 20.) Mr. Nasta was employed by EngagePoint from November 2, 2015, through March 15, 2017. (*Id.* ¶ 21.) Both Plaintiffs had written employment contracts with EngagePoint that entitled them to severance if they were terminated by the company without cause.

In 2013, EngagePoint started experiencing financial difficulties. The company then took a series of steps to address its financial issues. (*Id.* ¶ 23.) First, in December 2014, EngagePoint accepted a $20 million loan—secured by EngagePoint's assets—from defendant Brevet Capital, a venture capital firm.[2] (*Id.* ¶ 24.) (*Id.* ¶¶ 26, 28.) EngagePoint also accepted additional loans from Brevet between December 2014 and March 2017, eventually totaling approximately $65 million. EngagePoint failed to make timely payments to Brevet on these loans. As a result, Brevet began to "exercise[] daily control over the day-to-day operation of EngagePoint" and "direct[] EngagePoint's actions." (*Id.* ¶ 34.)

Later, in April 2016, EngagePoint asked several of its employees, including Plaintiffs, to defer their salaries. (*Id.* ¶ 25.) Plaintiffs agreed to do so and both went without a salary for several months in the spring of 2016. Mr. Odjaghian also deferred his 2013 executive bonus of $217,568. (*Id.* ¶ 29.) Then, on March 15, 2017, Bradley White, the CEO of EngagePoint, terminated Plaintiffs' employment without cause. (*Id.* ¶ 37.) EngagePoint also terminated two

---

[1] Considering that this Memorandum evaluates a Rule 12 motion to dismiss, the Court here summarizes the allegations as presented by Plaintiff in her complaint. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). Where indicated, the Court supplements these allegations with evidence from outside the pleadings, as is permitted when assessing a factual challenge to jurisdiction. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

[2] As will be explained *supra*, Defendants assert that Brevet Capital is not the entity that extended credit to EngagePoint. Rather, Brevet Direct Lending—Short Duration Fund, L.P., is the entity that extended the loan.

other executives on the same day and had previously terminated another two executives in an attempt to save money.

Plaintiffs entered into severance agreements with EngagePoint "that provided that EngagePoint would pay them their severances and monies owed in exchange for the release of their claims against EngagePoint." (*Id.* ¶ 41.) Although EngagePoint owed each of the plaintiffs hundreds of thousands of dollars pursuant to these agreements, it made only one payment of $5,000 to each on May 11, 2017. (*Id.* ¶ 43.)

Shortly thereafter, Defendant White informed Plaintiffs that EngagePoint could not continue to make severance payments to Plaintiffs because Brevet had foreclosed on its loans and sold all of EngagePoint's assets. The foreclosure sale happened very quickly: it was announced on May 27, 2017, and executed on June 5, 2017. Defendant HHS, which is controlled by Brevet Capital, acquired all of EngagePoint's assets—including "significant ongoing streams" of revenue—through the foreclosure auction conducted by Brevet. Despite purchasing EngagePoint's assets on June 5, 2017, HHS was not formed until June 6, 2017. The remaining EngagePoint employees, including Defendant White, were immediately employed by HHS after its formation. (*Id.* ¶ 59.) "HHS performs the same business with the same products and customers as did EngagePoint" and is owned and controlled by Brevet Capital. (*Id.* ¶ 62.)

## II. Legal Standards

### A. Standard for Dismissal under Rule 12(b)(2)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) is a test of the court's personal jurisdiction over the defendant. "[W]hen, as here, the court addresses the question [of personal jurisdiction] on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie

showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005) (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). The court must construe the relevant allegations in the light most favorable to the plaintiff. *Id.* "[T]he plaintiff bears the burden of proving grounds for jurisdiction by a preponderance of the evidence." *Cricket Group, Ltd. v. Highmark, Inc.*, 198 F. Supp. 3d 540, 542 (D. Md. 2016).

### B. *Standard for Dismissal under Rule 12(b)(6)*

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. An inference of a "mere possibility of misconduct" is not sufficient to support a plausible claim. *Id.* at 679. However, "a well–pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556. Even so, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id*. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (citation omitted) (quoting *Twombly*, 550 U.S. at 555, 557).

### III. Analysis

Plaintiffs allege that each of the defendants qualified as their employers and therefore each is liable for the wages Plaintiffs are still owed pursuant to their severance agreements. Plaintiffs

4

have also brought an additional claim—breach of contract—against only EngagePoint (and HHS as its alleged successor) and an additional claim—invalid foreclosure—against only Brevet Capital. Defendants do not dispute that EngagePoint was Plaintiffs' employer and therefore may be liable for Plaintiffs' unpaid wages. However, Defendants argue that neither Brevet Capital, HHS, nor Mr. White qualify as Plaintiffs' employer under the MWPCL. Additionally, Defendants contend that Plaintiffs have abandoned their contract and foreclosure claims, and therefore those claims should be dismissed. Finally, Brevet Capital argues that the Court lacks personal jurisdiction over it. For the reasons set forth below, Plaintiffs' motion for default judgment against EngagePoint will be granted and Defendants' motion to dismiss will be granted.

### A. *Personal Jurisdiction as to Brevet Capital*

Defendants are nonresidents of the State of Maryland, but may be subject to personal jurisdiction here pursuant to Maryland's long-arm statute and consistent with the federal constitutional guarantee of due process. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396–97 (4th Cir. 2003). Under Maryland law, the exercise of long-arm jurisdiction is permitted by statute to the extent such jurisdiction is consistent with the Fourteenth Amendment's due process requirements; thus, the "statutory inquiry merges with [the] constitutional examination." *Kortobi v. Kass*, 978 A.2d 247, 256–57 (Md. 2009). Two types of personal jurisdiction exist: general jurisdiction, based upon continuous and systematic activities by a defendant in the state, and specific jurisdiction, premised upon a defendant's contacts with the forum state when the suit arises out of those specific contacts. *Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014). If a plaintiff has made a showing of either type, then

personal jurisdiction is established. Defendants argue that Plaintiffs have not established either form of personal jurisdiction as to Brevet Capital. The Court agrees.

First, Brevet Capital is not subject to general jurisdiction in Maryland. Plaintiffs have not alleged any facts that could possibly support general jurisdiction as to Brevet Capital. Brevet Capital is not incorporated in Maryland nor is its principal place of business in Maryland. (ECF No. 7-2.) Moreover, Brevet Capital "does not directly hold or own any assets in Maryland, and is not aware of any indirect interests in assets in Maryland." (Mot. to Dismiss, ECF No. 7-1, at 22 (citing ECF No. 7-2 ¶6–8).) Plaintiffs do not contend otherwise.

Second, Brevet Capital is not subject to specific jurisdiction because it is apparently not the entity that entered into a secured transaction with EngagePoint. Simply put, Plaintiffs named the wrong party in their Complaint. According to Defendants, it was in fact Brevet Direct Lending—Short Duration Fund, L.P., and not Brevet Capital Management, LLC—the party named in the Complaint—that extended credit to EngagePoint and subsequently foreclosed on the collateral securing the loans to EngagePoint. (Bunge Decl., ECF No. 7-2.) Thus, while Defendants do not dispute that Brevet Direct Lending may be subject to personal jurisdiction in this court, it is not a named party to this action.

Plaintiffs make no attempt to show that Brevet Capital is the proper defendant. Instead, they seemingly concede that the wrong party may have been named and suggest that any error may be corrected following discovery. However, the Court cannot subject a party to discovery when it lacks jurisdiction over that party, as is the case here. Plaintiffs bear the burden of establishing jurisdiction "by a preponderance of the evidence," *Cricket Group*, 198 F. Supp. 3d at 542, yet they have failed to meet even this low bar at this stage in the proceedings.[3]

---

[3] It is not entirely uncommon for such mistakes to occur given that many corporate entities share similar names with their affiliates. However, the proper course of action in such circumstances is for a plaintiff to seek

6

Accordingly, Plaintiffs' claims against Brevet Capital will be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2).

### B. HHS Successor Liability

Plaintiffs allege that HHS is liable for EngagePoint's conduct as its corporate successor. If Plaintiffs can show that HHS is EngagePoint's successor, then HHS may qualify as Plaintiffs' employer under the MWPCL and it may be held responsible for EngagePoint's alleged breach of contract.

Typically, "a corporation which acquires the assets of another corporation is not liable for the debts and liabilities of the predecessor corporation." *Baltimore Luggage Co. v. Holtzman*, 562 A.2d 1286, 1289 (Md. Ct. Spec. App. 1989). There are four exceptions to this rule, however. *Id.* Plaintiffs allege that two of those exceptions are implicated in this case: (1) "the transaction [wa]s entered into fraudulently to escape liability for debts," and (2) "the purchasing corporation is a mere continuation of the selling corporation." *Id.* at 1290 (citing *Golden State Bottling Co. v. National Labor Relations Board*, 414 U.S. 168, 182–83 n.5 (1973)).

#### 1. Fraud Exception

Plaintiffs allege that the conveyance of EngagePoint's assets to HHS was "a Fraud by Brevet, EngagePoint, HHS, and White to Avoid Debts Owed to the Terminated Executives and Other Creditors." (ECF No. 1, at 8.) The fraud exception to the rule against successor liability has been codified, at least implicitly, in Maryland. "The Maryland Uniform Fraudulent Conveyance Act ("MUFCA"), Md. Com. Law Code Ann. §§ 15–201 *et seq.*, . . . . allows a creditor of the transferor to attach or levy on the property conveyed to the transferee, if the

---

leave to amend his or her complaint to name the correct entity. Interestingly, Plaintiffs' have not sought to amend their Complaint here, despite the fact that Defendants have appropriately identified the correct party for Plaintiffs. Given these circumstances, Plaintiffs' desire to rely on discovery to identify the proper party is unnecessary and inappropriate.

transfer is fraudulent." *Baltimore Luggage*, 562 A.2d at 1290; *see* Md. Com. Law Code Ann. § 15–209(a)(2). A conveyance is fraudulent if, *inter alia*, it is "made . . . without a fair consideration" and will render the transferor "insolvent," Md. Com. Law Code Ann. § 15–204, or if it is "made . . . with actual intent . . . to hinder, delay, or defraud present or future creditors." *Id.* § 15-207.

Plaintiffs generally allege that the conveyance of EngagePoint's assets to HHS was fraudulent, but they do not do so with any particularity. Indeed, outside of a single heading in their Complaint, Plaintiffs do not even mention the word fraud. Plaintiffs do not point to any specific provision of the MUFCA as the basis for their fraud claim. For that matter, they do not even identify the MUFCA in their Complaint. Moreover, in their opposition to Defendants' motion to dismiss, Plaintiffs do not mention the fraud exception at all, apparently abandoning this basis for successor liability (to the extent they ever even validly raised it).

In any event, Plaintiffs certainly do not support their fraud allegation with the requisite particularity to satisfy Federal Rule of Civil Procedure 9(b). Rule 9(b) states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The "circumstances constituting fraud or mistake" include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)). The only particular facts Plaintiffs provide in support of their fraud allegation go to the limited notice (one week) and short duration (six hours) of the auction of EngagePoint's assets. Plaintiffs suggest that this was an insufficient amount of time to value EngagePoint's assets, yet they do not allege that the conveyance to HHS was made without fair consideration. In sum, the bare

8

allegation of fraud in the Complaint lacks sufficient particularity and factual support and therefore does not provide a basis for successor liability under the fraud exception.

### 2. *Mere Continuation Exception*

Plaintiffs primarily argue that HHS is a mere continuation of EngagePoint and therefore liable for EngagePoint's debts. The "mere continuation" exception has not been codified in Maryland, but it is well established in Maryland common law. *See Acad. of IRM v. LVI Envtl. Servs., Inc.*, 687 A.2d 669 (Md. 1997); *Nissen Corp. v. Miller*, 594 A.2d 564 (Md. 1991); *Baltimore Luggage*, 562 A.2d 1286. The policy underlying the "mere continuation" exception is commonsense:

> The exception is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors. In other words, the purchasing corporation maintains the same or similar management and ownership but wears a "new hat." To allow the predecessor to escape liability by merely changing hats would amount to fraud. Thus, the underlying theory of the exception is that, if a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability.

*Baltimore Luggage*, 562 A.2d at 1293 (citations omitted).

Courts in Maryland look to certain indicia to determine whether a corporate successor is a mere continuation of its predecessor and thus liable for the predecessor's debts. The two primary indicia supporting successor liability are: (1) "common officers, directors, and stockholders," and (2) "only one corporation in existence after the completion of the sale of assets." *Id.*; *see Nissen*, 594 A.2d at 567 ("This exception focuses on the continuation of management and ownership.") These factors, however, are neither necessary nor sufficient to support successor liability in every case. *Id.* Rather, courts should consider the totality of the circumstances and determine successor liability on a case-by-case basis. *Id.* Other relevant factors to consider in this analysis include the successor's "continuation of the seller's business practices and policies and the

9

sufficiency of consideration running to the seller corporation in light of the assets being sold." *Id.* Ultimately, however, a successor's liability depends not on the *similarity* of the continuing business enterprise but rather on the *singularity* of the two corporate entities at issue. *Nissen Corp.*, 594 A.2d at 567 ("The gravamen of the traditional 'mere continuation' exception is the continuation of the *corporate entity* rather than continuation of the business operation. . . . In contrast, the continuity of *enterprise* theory focuses on continuation of the business operation or enterprise where there is no continuation in ownership."); *Acad. of IRM*, 687 A.2d at 677 (1997) ("Successor liability predicated on continuity of the entity is to be distinguished from continuity of the enterprise.").

Plaintiffs have plainly alleged facts showing a continuity of *business enterprise* between EngagePoint and HHS, but have failed to allege facts showing a continuity of *corporate entity*. Plaintiffs allege that, upon its creation, "HHS immediately employed EngagePoint's remaining employees, including the management team of CEO White, Faiyaz Shikari, Sonia Lucas, and Thomas Swider." (ECF No. 1 ¶59.) They also plausibly allege that "HHS performs the same business with the same products and customers as did EngagePoint." (*Id.* ¶ 62.)

Plaintiffs, however, also allege facts that directly undercut their mere continuation argument. First, Plaintiffs allege that "*EngagePoint continues to exist*, and . . . continues to have active services contracts with several states including Missouri, Minnesota, and California." (*Id.* ¶ 49.) The alleged continued existence of EngagePoint as a separate corporate entity, with "active service contracts," is fundamentally at odds with Plaintiffs' contention that HHS is a mere continuation of EngagePoint.[4] *See, e.g.*, *Baltimore Luggage*, 562 A.2d at 1294 (rejecting

---

[4] In their opposition brief, Plaintiffs contend that "[t]he Complaint also alleges that only one corporation, HHS, is in operation following the sale of EngagePoint's asset [sic] (which is evidenced by EngagePoint's failure to answer this suit)." (ECF No. 17, at 14.) This is simply not true. The Complaint states the exact opposite, and, "for the purposes of a motion to dismiss, Plaintiff[s] [are] bound by [their] Complaint and cannot amend it through [their]

mere continuation theory in part because there was not "a sole corporation remaining after the sale"). Second, Plaintiffs do not allege continuity of ownership. Rather, they allege the exact opposite. Plaintiffs allege that "Brevet owns and controls HHS." (ECF No. 1, ¶ 61.) Brevet, however, did not own EngagePoint; according to Plaintiffs, Brevet Capital loaned money to EngagePoint and then foreclosed on its loans. Plaintiffs do not identify any common stockholders or directors between EngagePoint and HHS. *Cf. Baltimore Luggage*, 562 A.2d at 1294 (rejecting mere continuation theory due to change in ownership despite owner of predecessor corporation maintaining a twenty to twenty-five percent ownership interest in successor corporation). Instead, Plaintiffs rely solely on the transfer of employees from EngagePoint to HHS. This is not enough. *See Acad. of IRM*, 687 A.2d at 679 (rejecting mere continuation theory where no shareholder of predecessor corporation held any ownership interest in successor and "only transfusion from old to new was at the level of employees").

Moreover, and despite Plaintiffs' suggestions to the contrary, it appears that HHS, an entity owned and operated by Brevet Capital, gave fair consideration for EngagePoint's assets. According to Plaintiffs, EngagePoint was indebted to Brevet Capital in the amount of $65 million. In *Academy of IRM*, The Maryland Court of Appeals dealt with a strikingly similar scenario and found that successor liability was inappropriate. In *Academy of IRM*, a creditor of the transferor corporation conducted a friendly foreclosure. At the creditor's direction, the debtor-transferor conveyed all of its assets to the creditor's assignee—just as EngagePoint conveyed all of its assets to HHS at Brevet Capital's direction. The Maryland high court

---

briefs." *Stahlman v. United States*, 995 F. Supp. 2d 446, 453 (D. Md. 2014); *accord Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (noting that plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"). Plaintiffs attempt to walk back this allegation in their opposition brief, stating that HHS "now controls" the contracts "that EngagePoint may continue to hold." (ECF No. 17, at 14.) This equivocal statement, however, provides little to no clarity regarding the continued existence of EngagePoint.

concluded that "a creditor taking over an insolvent debtor to collect a bona fide debt pursuant to a valid, perfected security interest" constituted sufficient consideration from the purchaser to the seller. 687 A.2d at 680 (quoting *Uni-Com Nw., Ltd. v. Argus Pub. Co.*, 737 P.2d 304, 313 (Wash. Ct. App. 1987); *see also State ex rel. Donahue v. Perkins & Will Architects, Inc.*, 413 N.E.2d 29 (Ill. App. Ct. 1980) (rejecting mere continuation theory where secured creditor of transferor corporation liquidated transferor and formed buyer corporation to purchase transferor's assets). In short, Plaintiffs have failed to plausibly allege that EngagePoint received insufficient consideration for the transfer of its assets to HHS.

Accordingly, the Court finds that Plaintiffs have not plausibly alleged that HHS is liable for the debts of EngagePoint under any theory of corporate successor liability.[5]

### C. *MWPCL Claim*

The only remaining claim is the MWPCL claim against Mr. White. Plaintiffs allege that Mr. White, the former CEO of EngagePoint and current CEO of HHS, qualified as their employer under the MWPCL, and therefore he is personally liable for their unpaid wages.

The MWPCL "requires employers to establish regular pay periods" and "prohibits employers from making unauthorized deductions." *Friolo v. Frankel*, 819 A.2d 354, 362 (Md. 2003) (citing Md. Code Ann., Lab. & Empl. § 3-501, *et seq.*). "Among other things, the MWPCL 'protects employees from wrongful withholding of wages upon termination.'" *Macsherry v. Sparrows Point, LLC*, No. CV ELH-15-22, 2017 WL 3315262, at *30 (D. Md. Aug. 3, 2017) (quoting *Stevenson v. Branch Banking and Trust Corp., t/a BB&T*, 861 A.2d 735, 743 (Md. Ct. Spec. App. 2004)). "The principal purpose of the Act 'was to provide a vehicle for

---

[5] For this reason, HHS also does not qualify as Plaintiffs' employer under the MWPCL. It is undisputed that HHS did not exist until after Plaintiffs' employment was terminated. HHS's MWPCL liability is premised entirely on its liability, if any, as successor to EngagePoint. Having found that HHS is not subject to successor liability, the Court concludes that HHS may not be held liable under the MWPCL.

12

employees to collect, and an incentive for employers to pay, back wages.'" *Medex v. McCabe*, 811 A.2d 297, 304 (Md. 2002) (quoting *Battaglia v. Clinical Perfusionists*, 658 A.2d 680, 686 (Md. 1995)). Accordingly, "[a]n MWPCL claim cannot be sustained if the plaintiff fails to allege that the defendant was involved in payment of [his] wages." *Quickley v. Univ. of Maryland Med. Sys. Corp.*, No. CIV. CCB-12-321, 2012 WL 4069757, at *6 (D. Md. Sept. 14, 2012) (citing *Jennings v. Rapid Response Delivery, Inc.*, No. CIV. WDQ-11-0092, 2011 WL 2470483, at *5 (D. Md. June 16, 2011); *Deras v. Verizon Maryland, Inc.*, No. DKC 09–0791, 2010 WL 3038812, at *8 (D. Md. July 30, 2010)).

The MWPCL defines an "employer" as "any person who employs an individual in the State or a successor of the person." Md. Code Ann., Lab. & Empl. § 3-501(b). The term "[e]mploy" means "to engage an individual to work," *id.* § 3-101(c)(1), and includes "allowing an individual to work" and "instructing an individual to be present at a work site." *Id.* § 3-101(c)(2)(i) and (ii). A "mere supervisor" of another employee is not an "employer." *Watkins v. Brown*, 173 F. Supp. 2d 409, 415–16. Rather, the term "employer" in the MWPCL has its "commonly understood meaning . . ., which contemplates some sort of contractual relationship involving the payment of wages in exchange for services." *Id.* at 414.

Notably, the MWPCL contains a narrower definition of "employer" than that found in the federal Fair Labor Standards Act ("FLSA"), and its state equivalent, the Maryland Wage and Hour Law ("MWHL").[6] *See Munoz v. Baltimore Cty.*, No. CIV.A. RDB-11-02693, 2012 WL

---

[6] The Maryland Court of Special Appeals reached a different conclusion when comparing the MWPCL to the MWHL. *See Campusano v. Lusitano Const. LLC*, 56 A.3d 303, 308 n.5 (Md. Ct. Spec. App. 2012) (rejecting *Watkins'* interpretation of MWPCL and stating that "the broad definition of 'employ' in . . . § 3–101 (as incorporated by Payment and Collection Law § 501(b)), evinces the legislature's intent to expand the common law definition of 'employer,' just as it did with the MWHL"). "A federal court sitting in diversity must apply the law of the state in which the court is located." *Royster v. Gahler*, 154 F. Supp. 3d 206, 220 (D. Md. 2015) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007)). "In doing so, the federal court may defer to the interpretation of state law provided by a state's *high* court." *Royster*, 154 F. Supp. 3d at 220 (emphasis added). The Maryland Court of Appeals does not appear to have

3038602, at *13 (D. Md. July 25, 2012) ("[T]he definition of 'employer' for purposes of the Wage Payment and Collection Law [i]s not as broad as the definition of 'employer' for purposes of the Fair Labor Standards Act or the Maryland Wage and Hour Law . . . ."); *Iraheta v. Lam Yuen, LLC*, No. CIV.A. DKC 12-1426, 2012 WL 5995689, at *4 (D. Md. Nov. 29, 2012) (noting that MWPCL's definition of "employer" is "more restrictive than either the FLSA or the MWHL as it does not expand employer liability to those acting on behalf of the employer"); *accord Fenzel v. Grp. 2 Software, LLC*, No. CV DKC 13-0379, 2016 WL 865363, at *14 (D. Md. Mar. 7, 2016). The FLSA and MWHL both define "employer" to also include a person who acts "directly or indirectly in the interest of" another employer in relation to an employee. *Id.* § 3-401(c); 29 U.S.C. § 203(d); *see also Watkins*, 173 F. Supp. 2d at 415 ("[T]he fact that the Maryland General Assembly, in these other sections, has specifically added this language but chose not to in the MWPCL is strong evidence that the legislature did not intend to broaden the meaning of 'employer' in [the MWPCL]."). Additionally, the MWPCL—unlike the MWHL and FLSA—does not focus on "the amount of wages payable but rather the duty to pay whatever wages are due on a regular basis and to pay all that is due following termination of the employment." *Friolo*, 819 A.2d at 362.

Here, Plaintiffs Complaint suffers from a fundamental flaw: It does not allege that Mr. White was involved in payment of their wages. On the contrary, Plaintiffs clearly state, repeatedly, that they had a "contractual relationship involving the payment of wages," *Watkins*, 173 F. Supp. 2d at 414, with EngagePoint, not Mr. White. Plaintiffs allege that:

- "[They] each had written *employment contracts with EngagePoint* . . .," (ECF No. 1 ¶ 22 (emphasis added));

---

addressed the breadth of the term "employer" in the MWPCL, and the Court is neither bound nor persuaded by the broad interpretation adopted by the Maryland Court of Special Appeals in *Campusano*.

14

- "*EngagePoint entered severance agreements* with Plaintiffs that included compensation for their deferred wages and severance," (*Id.* ¶ 4 (emphasis added));

- "*EngagePoint . . . had . . . agreements* to repay executives like Plaintiffs deferred salary and severance," (*Id.* ¶ 3 (emphasis added));

- "*EngagePoint asked several of its executives to defer their salaries* because of cash flow problems," (*Id.* ¶ 25 (emphasis added));

- "*EngagePoint agreed* to provide Nasta C-1 shares in an amount equal to the salary he deferred," (*Id.* ¶ 27 (emphasis added));

- "Odjaghian also deferred his 2013 executive bonus of $217,568 *at EngagePoint's request*, (*Id.* ¶ 29 (emphasis added));

- "EngagePoint offered Odjaghian and Nasta severance agreements that provided that *EngagePoint would pay them their severances and monies owed*, (Id. ¶ 41 (emphasis added)).

Plaintiffs allegations reveal that EngagePoint was their employer for purposes of the MWPCL and that Mr. White was a "mere supervisor," and at times messenger, acting on behalf of their shared corporate employer. "Courts analyzing the MWPCL have rejected any interpretation that would encompass supervisors, officers, or other agents acting on behalf of the corporate employer." *Caseres v. S & R Mgmt. Co., LLC*, No. 12-CV-01358-AW, 2012 WL 5250561, at *4 (D. Md. Oct. 24, 2012) (citing *Watkins*, 173 F. Supp. 2d at 416; *Hosack v. Utopian Wireless Corp.*, No. DKC 11–0420, 2011 WL 1743297, at *5 (D. Md. May 6, 2011)). In short, "[t]he notion that a supervisor of an employee (who himself is paid a wage by the employer) is somehow responsible for the payment of wages to another employee whom he supervises is inconsistent with the plain language of the statute." *Watkins*, 173 F. Supp. 2d at 414.

## IV. Conclusion

For the foregoing reasons, an Order shall enter GRANTING Defendants' Motion to Dismiss (ECF No. 7).

DATED this 5th day of July, 2018.

BY THE COURT:

/s/
James K. Bredar
Chief Judge